# United States District Court
## Western District of Virginia
### Harrisonburg Division

_____ )
                                   )
**MICHELLE R. SCOTT**,             )          Civil No.: 5:11cv00129
                                   )
       *Plaintiff,*              )
**v.**                             )          **REPORT AND**
                                   )          **RECOMENDATION**
**MICHAEL ASTRUE**,                )
Commissioner of Social Security,   )
                                   )          By:  Hon. James G. Welsh
       *Defendant.*              )                U. S. Magistrate Judge
_____ )


    Michelle R. Scott ("the plaintiff") brings this civil action challenging a final decision of

the Commissioner of the Social Security Administration ("the agency") denying her applications

for a period of disability and disability insurance benefits ("DIB") [1] and for Supplemental

Security Income ("SSI") under Titles II and XVI of the Social Security Act, as amended ("the

Act"), 42 U.S.C. §§ 416 and 423 and 42 U.S.C. §§ 1381 *et seq*., respectively.  Jurisdiction of the

court is pursuant to 42 U.S.C. § 405(g).


    Her claims were protectively filed on April 15, 2008.  (R.13,187-200).  Therein, she

alleges that she became disabled beginning February 28, 2006, prior to becoming twenty-two

years of age, due to "cystic fibrosis, [associated] liver problems" and "catch[ing] a lot of germs."

_____

[1]  The plaintiff last met the insured status requirements for DIB on June 30, 2006.  (R.13,15).

(R.13,15,189,194,237-238).  Following the initial denial of her claims, it was determined on reconsideration that her condition equaled listing [2] 3.04C [3] as of September 1, 2008.  (R.13,87-134,286).  Finding that the plaintiff also met the relevant non-medical requirements, she was awarded SSI, but her DIB claim was denied on the basis of an absence of a disabling condition prior to the expiration of her insured status.  (R.135–141,286).  After an administrative hearing, an administrative law judge (ALJ) also denied her claim for DIB. (R.10–26).  The Appeals Council subsequently denied the plaintiff's request for review (R.1–5), and the unfavorable ALJ decision now stands as the Commissioner's final decision.  *See* 20 C.F.R. § 404.981.

Along with his Answer to the plaintiff's complaint, the Commissioner has filed a certified copy of the Administrative Record ("R.") which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision.  Both parties have filed motions for summary judgment; oral argument was conducted by telephone on December 13, 2012.  (Doc ##. 12,16,19).  By standing order, this case is now before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    SUMMARY AND RECOMMENDATION

---

[2]  The Listing of Impairments ("the listings") is in appendix 1 of subpart P of part 404 of 20 C.F.R.  It describes for each of the major body systems impairments that the agency considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525 and § 416.925.

[3]  A "[p]ersistent pulmonary infection accompanied by superimposed, recurrent, symptomatic episodes of increased bacterial infection occurring at least once every 6 months and requiring intravenous or nebulization antimicrobial therapy."

In her brief supporting her motion for summary judgment, the plaintiff raises three arguments. Her first argument is that the ALJ erred in failing to find that her medical impairment equaled listing 3.04C prior to the expiration of her insured status. Second, she argues that the ALJ should have employed the services of a medical advisor to help him identify the onset date of her disability. And finally, she contends that the ALJ improperly evaluated her credibility. Based on a careful review of the entire record, including consideration of the views of the parties, for the reasons discussed herein in detail, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**, the Commissioner's motion for summary judgment be **GRANTED**, the plaintiff's motion be **DENIED,** and this case be **STRICKEN** from the active docket of the court.

## II. STANDARD OF REVIEW

The court's review in this case is limited to determining whether the factual findings of the Commissioner are supported by substantial evidence and whether they were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642). The court is "not at liberty to re-weigh the evidence

. . . or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (internal quotation marks omitted).

## III.     THE ADMINISTRATIVE RECORD

### Medical History

Ms. Scott was diagnosed with cystic fibrosis ("CF") as an infant, and particularly since 2005 she has received decisionally relevant medical treatment for this condition. (R.33-37,289-312,313-363,365-400,435-465). Beginning with a first serous exacerbation of her condition in January 2005, she has been treated with intravenous antibiotics for significant viral infection flare-ups of her chronic bacterial infections and with oral antibiotics for "lingering upper respiratory symptoms" and for sinobronchitis (chronic paranasal sinusitis with recurrent bronchitis). (R.289-293,314-317,336-363,374,375,424-432). At the time of her June assessment, she was continu[ing] to do quite well. (R.378). In September she experienced an exacerbation of symptoms, which was treated effectively with a two week course of intravenous antibiotics. (R.69-70,382-385,390-391,407-423,572–575,589–596). Chest radiographs on September 25, 2005 demonstrated some patchy opacities in the right lower lobe lingual that were the radiologist felt were "likely … mucus plugging and peribronchial thickening." (R.392,587). Although the radiologist noted this condition to be consistent with the CF diagnosis, his report suggests no acute or medically significant change in the plaintiff's condition. (*Id*.; *see* R.94). In December she experienced another mild exacerbation involving an increased cough, low-grade fever and decreased pulmonary function; this was treated with oral antibiotics. (R.386-387).

4

In the Fall of 2005 the plaintiff discovered that she was pregnant. She apprised Deborah Froh, M.D., her pediatrician at UVa Medical Center, of this development during a routine office visit on January 4, 2006. (R.388-389,578-578). Dr. Froh found the plaintiff's condition to be stable, and she made no treatment changes. (R.388).

Between February 28, 2006 (the plaintiff's alleged disability onset date) and June 30, 2006 (her date last insured), the record shows that she sought CF-related medical attention on only four occasions. On March 1 the plaintiff, accompanied by her fiancé, saw Dr. Froh for a routine office visit. (R.580-81). At that time she told Dr. Froh she had been feeling pretty good, and other than displaying a "baseline amount of cough," Dr. Froh's complete review of her systems "was unremarkable." (R.580). Spirometry values recorded by Dr. Froh were a FVC (forced vital capacity) of 3 L (93% predicted), a FEV1 (forced expiratory volume) of 2.44 L (84% predicted), and MEF (mid-expiratory flow rate) of 71% predicted. (R.581). In her office record, Dr. Froh also noted that the plaintiff's FEV1 "ha[d] stayed relatively stable the last few times," and she observed that the plaintiff was in "good shape." (R.581).

Three weeks later, on March 23, 2006, the plaintiff was again seen by Dr. Froh with complaints of a worsened cough and shortness of breath. (R.583). Her FVC was 3.09 L (85% predicted); her FEV1 was 2.38 L (80% predicted), and her MEF was 61% predicted. (R.583). Dr. Froh gave the plaintiff a few puffs of Albuterol and administered hypertonic solution; however, she declined to prescribe any antibiotic therapy and noted that "overall, [the plaintiff] look[ed] really good." (R.583).

When the plaintiff next saw her pediatrician for a regularly scheduled follow-up appointment on June 7, 2006, she told Dr. Froh that she was doing well except for some mild sinus drainage and constipation. Her FVC was 2.95 L (90% predicted); her FEV1 was 2.38L (80% predicted), and her MEF was 68% predicted. (R.585). Dr. Froh prescribed Augemntin for the plaintiff's sinus problem; she noted that the plaintiff "looked great," and she recorded how "very pleased" she was at how well the plaintiff was doing. (R.585-586).

Unrelated to her CF, on June 14, 2006 the plaintiff was treated at Carilion Roanoke for pregnancy-related pain and strong contractions. (R.464). Macrobid and Pyridium were administered, and her contractions subsided. (R.464). Three weeks later (and five days after expiration of her insured status), the plaintiff went into labor, and on July 6, 2006 she delivered a healthy baby girl at Carilian Roanoke. (R.451–57). On July 8, she was discharged from the hospital (R.457); however, one day later she was seen in the emergency room with complaining of a sudden onset of acute "lower back to neck" pain without injury. (R.443-448). Other than noting her history of CF, of being three days post-partum and being in "mild" discomfort, the results of a physical examination and various laboratory studies disclosed no medically significant abnormality or condition. (R.443-449). In connection with this ER visit, there is no report of any complaint by the plaintiff of any significant change in her respiratory condition, and none is reported in the detailed physical examination results. *Id*.

During the remainder of 2006, the plaintiff's medical records show that she twice sought treatment for transient medical problems and once for an exacerbation of her CF symptoms. At the end of July she was treated with antibiotics for a combination of fever, abdominal pain and

earaches.  (R.563-564).  In August she was treated with pain medication for a sharp chest pain occasioned by her moving large furniture.  (R.560-561).  And in November she experienced an exacerbation of her CF symptoms, which required inpatient treatment with intravenous antimicrobial therapy.  (R. 466–488).  Her symptoms responded to treatment, and she was discharged on the fourth hospital day.  (R.466-467).

When the plaintiff was seen for a June 2007 office visit, she presented with an increased cough and decreased respiratory function. [4]  (R.644).  Based on her reduced lung function and increased symptoms, Dr. Froh prescribed a three-week course of intravenous antibiotics.  (R. 640-645).  Similarly reduced lung function was noted by Dr. Froh, when she saw the plaintiff in September [5] and in October. [6]  In March 2008, the plaintiff experienced another exacerbation of CF symptoms along with significantly increased pulmonary symptoms.  At that time, her FVC was 2.49 L (75% predicted); her FEV1 was 1.64 L (56% predicted), and her MFC was 24% predicted, the lowest rate observed to that point. (R.628).  A CT pulmonary angiogram demonstrated diffuse bronchiostasis and mucous plugging.  (R.61).  Another course of intravenous antibiotics was prescribed by Dr. Froh.  (R.624-628).  During this exacerbation of her CF symptoms, the plaintiff also experienced an acute episode of loss of consciousness followed by confusion and left-side motor and sensory impairment.  (R.490).  A brain MRI revealed no objective neurologic abnormalities, and the plaintiff's symptoms soon subsided.  (R.490,500-501).  The medical record further shows that the plaintiff experienced additional

---

[4] FVC: 2.54 L (77% predicted); FEV1: 1.83 L (63% predicted). (R. 644).
[5] FVC: 2.8 L (85% predicted); FEV1: 1.86 L (64% predicted). (R. 638).
[6] FVC: 2.63 L (80% predicted); FEV1: 1.75 L (60% predicted). (R. 636).

episodes of CF symptom exacerbations in December 2008, April 2009, April 2010, and October 2010.  As in the past, each was treated with intravenous antibiotics.  (R.769, 806,811-812,832).

## Educational Background and Vocational History

Scott has a high-school education.  (R. 31–32,67,82,244).  She has tried to continue her education at Virginia Western Community College, but because of her illness has been unable to complete a full semester of classes.  (R.32,39-40).  Based on her work history, the ALJ found that she has no past relevant work. (R.20).  In June 2003 she obtained work as a part-time cleaner at Diamond Hill General Store in Moneta, Va.  (R.33-34,213,238,246).  However, she quit this job because of health concerns in August.  (R.44,238, 246).  The following month, she started working part-time (20 hours per week) as a cashier at Food Lion (R. 33, 238, 246); she held this job until June 2005; however, she had frequent absences due to her illness (R.33–34,238).  In March, 2007, she started a full-time job as an animal care assistant at a veterinary office (R.238), but she had to quit in July due to frequent illness-related absences and the physical demands of the job.  (R.32-33).

## The Impact of Scott's Condition on her Daily Activities

In a function report dated July 6, 2008, Scott indicated that, after her cystic fibrosis started getting worse, she could not run or walk without stopping or sleep through the night or breathe easily and deeply without pain.  (R.257).  She would lose her breath frequently after walking a short distance or climbing even a one-half flight of stairs.  (R.261).  She does her laundry and runs the vacuum cleaner without any assistance, but she has a friend do any

housework that requires strong chemicals. (R.258). She avoids yard work because of the heat and because of its exacerbation of her allergies. (R.259). She does her own grocery shopping and prepares her own meals. (R.258–259). She is able to leave home on a fairly regular basis to go to church, to a sibling's house or to take her daughter to the library. (R.260).

Both in her function report responses and in her testimony, the plaintiff indicated that her CF condition has had a significant impact on her daily life and that a significant portion of her daily routine revolved around her medical care. (R.256). She stated that, since at least 2006, she spends three hours per day on medical care, including the use of an airway clearance vest to clear her lungs two to three times per day (R.34-35) and the use of a number of medications that make her "edgy." (R.36). She testified that she exercises daily in accordance with her doctors' instructions, but she is often tired and must lie down for an hour or more every day in the early afternoon (R. 36-37). She testified that she also has trouble sleeping, suffers from constant pain in her lungs and back. (R.37,39), and indicated in her report that symptom exacerbations disrupt her daily routine (R.263).

### Scott's Applications for SSI and DIB

On December, 29, 2005, Scott applied for SSI and DIB, claiming that she was disabled starting from June 30, 2005. [7] (R. 201–202). This application was denied on February 27, 2006, and reconsideration was not requested. (R. 201-202, 234). Her current applications (protectively

---

[7] The record also indicates that Scott applied (presumably through a parent or guardian) for and was denied SSI in 1989. (R. 201).

filed on April 15, 2008) allege an onset date of February 28, 2006. (R.194,233). Both were denied initially; however, on reconsideration, a disability examiner determined that Scott in fact was disabled as of September 1, 2008 and medically eligible for SSI (R.67,83,110-112,129) but not for DIB due to her uninsured status at the time of her disability onset. (R.87-113).

Following an administrative hearing, by written decision the ALJ concluded that the plaintiff's CF was a severe [8] impairment condition, but it was not of listing-level severity under either the pulmonary component of listing 3.04 or the digestive component under listing 5.00. (R.15-16). In particular, he found that her pulmonary function exceeded the levels provided in Table IV to Listing 3.04A, that she did not have episodes of bronchitis, pneumonia, hemoptysis, or respiratory failure meeting the durational requirements of 3.04B, that she did not have pulmonary infections that met the durational requirements of 3.04C, that she did not have fibrosis or cirrohosis of the liver that met the durational requirement of 5.00D, and that during the relevant period she retained the residual functional capacity to perform light work in a controlled air environment, with no more than occasional climbing of ramps and stairs, kneeling, and crawling. (R.15-17).

**Vocational Testimony**

At the administrative hearing, vocational testimony was provided by James Williams, a certified rehabilitation counselor. Asked by the ALJ to assume a person "generally capable of

---

[8] A severe impairment is any impairment or combination of impairments which significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. 404.1520(c)

light work" in a controlled environment free of fumes, dust, and other pollutants, where she could do "occasional climbing, kneeling, or crawling," he testified that such an individual would not be able to perform any of the plaintiff's prior jobs, including work as a cashier due to the requirement that one deal with people using perfumes. (R.46). Asked by the ALJ whether there were other jobs such a person could perform, the vocational witness replied that such jobs did exist and offered the following examples: Boat Rental Clerk, with 98,500 jobs nationally and 9,700 in the mid-Atlantic region; Garment Folder, with 60,000 jobs nationally and 7,000 in the mid-Atlantic region; Office Helper, with 85,000 jobs nationally and 6,500 in the mid-Atlantic region. (R. 47)

Asked further to assume that such an individual would be able to find work if she had to unpredictably miss work for about two consecutive weeks as least two times a year, due to exacerbation of her illness, the vocational witness testified that such an individual would not be able to find work. (R.47-48). Additionally, he testified that such an individual would also be unemployable if she would need to take unscheduled breaks during the day to lie down.

## IV.    DISCUSSION

### A.

Before proceeding further, it merits mention that there is an apparent clerical error on page 4 of the ALJ's decision. In one paragraph it appears he dispenses with the plaintiff's

argument that her impairment meets or equals one or more of the listing and proceeds to consider her residual functional capacity under the boldfaced heading that begins "**5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of light work….**" (R.16).   However , after a five-paragraph residual functional capacity assessment, the ALJ abruptly resumes what appears to be a ten-page, step-three analysis in which he explains why Scott's impairments do not meet any of the applicable listings.  Then, in the last paragraph on page 7 of his decision the ALJ resumes his discussion of the plaintiff's residual functional capacity.  (R.16).

Although an extended discussion of the listings as part of a residual functional capacity assessment will often create prejudicial error requiring vacation of the decision and remand; in the instant case the ten-paragraph listing analysis is not integrated logically or rhetorically with the residual functional capacity assessment that surrounds it on both sides.  Thus, it appears to be the result of a clerical error, perhaps caused by an errant cut-and-paste in a word processing program. Moreover, both parties have cited this extended, seemingly misplaced listing analysis in the relevant parts of their briefs that address the appropriateness of the ALJ's step-three determination.   Since this apparent clerical error neither affects the substance of the ALJ's decision nor prejudices either party, no remand on the basis of this error is warranted.  *See, e.g. Timmons v. Commissioner of Social Security*, 546 F.Supp.2d 778, 790 (E.D. Cal. 2008).

**B.**

The plaintiff principle argument on appeal is that the ALJ erred in failing to find that her impairment was medically equivalent to that listing 3.04C prior to the expiration of her insured status for DIB. In essence, it is her contention that her CF did not materially worsen between June 2006 and September 2008, *ergo* her impairment must have medically equaled listing 3.04C prior to June 2006. In response, [9] the Commissioner correctly points-out that a subsequent award of benefits for a later date is not relevant to an applicant's condition several months prior to the date awarded. *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652–53 (6th Cir. 2009). Although the plaintiff appears to concede the Commissioner's point *sub silentio*, she argues that the facts upon which the agency found disability in 2008 were present in 2006.

This effort to bootstrap her SSI award into a DIB award prior to the expiration of her insured status is without merit for multiple reasons. For one, the disability examiner definitively rejected the plaintiff's February 28, 2006 onset claim based on what he characterized to be a "large amount of records" in the file that contraindicated a disability finding before 2008. (R. 109). Second, the disability examiner's determination that the plaintiff's CF did not "medically equal" 3.04C was based, at least to a significant degree, on the lack of records from UVa

---

[9] The Commissioner also points out that the February 27, 2006 decision denying Scott benefits and her failure to seek review constitute a final determination adverse to her DIB claim. *See* 20 C.F.R. § 404.987(a) ("Generally, if you are dissatisfied with a determination … but do not request further review within the stated time period, you lose your right to further review and that decision becomes final."). The agency does not, however, ask the court to grant this decision any kind of preclusive or presumption-raising effect. In fact, it has expressed its disagreement with the approach taken by the Ninth Circuit to the effect that a past denial of benefits raises a "presumption of continuing non-disability." Acquiescence Ruling ("AR") 97-4(9) (expressing the agency's view that "[w]hen a subsequent claim involves an unadjudicated period, the determination or decision as to whether a claimant is disabled with respect to that period is made on a neutral basis, without any inference or presumption that a claimant remains 'not disabled'"). *Cf. Chavez v. Heckler*, 844 F.2d 691, 693 (9th Cir. 1988) (holding that an applicant denied benefits for a previous period must overcome a presumption of continuing disability to be entitled to benefits in the subsequent period).

Medical Center, that were before the ALJ and considered by him. (R.109). Third, the "medically equals" determination as of September 1, 2008 was based on a drastic decline in the plaintiff's pulmonary function levels as well as a decline in her residual functional capacity. (R.109).

In short, the findings by the disability examiner may support an argument that the plaintiff was disabled in March, 2008, when she suffered a severe exacerbation of symptoms requiring hospitalization. It might also conceivably support an argument in favor of an onset date of June 2007, when Scott quit her job at the animal shelter and had to undergo another course of intravenous antibiotic therapy. But these findings reject, not support, a finding of disability prior to the plaintiff's date last insured.

## C.

In support of the ALJ's non-disability determination, the agency argues that only evidence from the period between February 28, 2006 (the date of alleged onset) and June 30, 2006 (the date last insured) is relevant to this case. Although this contention is somewhat of an overstatement, because the evidence dated earlier that February 28 and later than June 30 can have probative value. In the instant case, however, the applicable listings require recurring ailments at a particular frequency or for a particular duration. For example, if the plaintiff could demonstrate that, in May and September of 2006, she suffered episodes of bacterial infection requiring intravenous antibiotics, she could conceivably meet listing 3.04C on the basis of that evidence.

Thus, the agency's suggestion that evidence predating February 28, 2006 is "barred by res judicata" misses the mark. Res judicata, bars claims, not evidence. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979); Wright & Miller, Federal Practice & Procedure § 4402; Restatement (Second) of Judgments §§ 18, 19. The ALJ must consider all evidence probative of facts material to the ultimate issues in the case, even if some of that evidence is also probative of immaterial facts. Herein, the ALJ in fact considered all of the relevant evidence in this case and the agency's mistake on this point does not require a remand.

### D.

Taking into consideration all of the relevant evidence, the conclusion is inescapable that the ALJ's determination that Scott did not meet or equal the requisite listing criteria is supported by substantial evidence. Under listing 3.04C, a claimant who suffers from cystic fibrosis with "persistent pulmonary infection accompanied by superimposed, recurrent, symptomatic episodes of increased bacterial infection occurring at least once every 6 months and requiring intravenous or nebulization antimicrobial therapy" is disabled. Scott required intravenous antibiotic therapy for exacerbations in January 2005, September 2005, November 2006, June 2007, March 2008, and December 2008—in other words, less than once every six months. Accordingly, she neither meets listing 3.04C nor does she directly contend that she did.

Seeking to avoid this result, the plaintiff instead argues that her impairment "medically equal[ed]" that listing. However, an impairment is medically equivalent to a listed impairment only "if it is at least equal in severity and duration to the criteria of any listed impairment." 20

C.F.R. § 404.1526.  Accordingly to "medically equal," just as to "meet" listing 3.04C, Scott must show that exacerbations of her cystic fibrosis were of sufficient frequency and severity so as to be equivalent to the listing, even though they may not have met the listing by its own terms. This she cannot do, and this claim of decisional error must be rejected.

She suffered respiratory exacerbations requiring intravenous antibiotics in September 2005 and November 2006.  Between those months Scott suffered mild exacerbations of her symptoms in early 2006, all of these were treated with oral antibiotics and none required an inpatient hospital stay. She carried a pregnancy successfully to term and her lung function stayed at baseline or near-baseline levels throughout the relevant period. Because he reasonably found that her exacerbations fell short of the severity contemplated by the listing, the ALJ's conclusion that Scott neither met nor equaled 3.04C is supported by substantial evidence.

**E.**

Scott next argues that Social Security Ruling ("SSR") 83-20 and *Bailey v. Chater*, 68 F.3d 75 (4th Cir. 1995), the leading Fourth Circuit case construing SSR 83-20, required the ALJ to hire a medical expert to determine the onset date.

This Ruling sets forth the agency's policy for determining the onset date of a disability. Under a heading entitled "*Onset in Disabilities of Nontraumatic Origin*," the ruling provides that

the agency will consider, along with the claimant's alleged onset date and work history, any medical or other relevant evidence to determining date of onset. The ruling also acknowledges that "slowly progressive impairments" can make it difficult to establish date of onset, particularly when adequate medical evidence is unavailable, and that in those cases "it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." Under the heading, entitled "*Present Evidence Not Available—Need for Inferences*," this agency Ruling further notes that medical evidence may support an inference that a claimant's impairment may have become disabling before the claimant first sought and received medical treatment for it. In other words, people do not always seek medical treatment the day they become too sick or injured to work. In such cases, the ALJ must make "an informed judgment based on the facts in the particular case." Because "[t]his judgment … must have a legitimate medical basis[,] [a]t the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred."

The Fourth Circuit examined the effect of SSR 83-20 in *Bailey v. Chater*. 68 F.3d at 79. Therein, the plaintiff challenged the ALJ's chosen disability onset date in district court, alleging that the ALJ failed to comply with SSR 83-20 and that the decision was unsupported by substantial evidence. The district court ruled for the Commissioner, but the Fourth Circuit reversed. After reviewing the text of SSR 83-20, the court declared that, "if the evidence of onset is ambiguous, the ALJ must procure the assistance of a medical advisor in order to render the informed judgment that the Ruling requires." *Id.* Finding that the onset date evidence was ambiguous, the court reversed and remanded for further fact finding. *Id.* at 79–80. As the court

further explained, "if the evidence of onset is ambiguous, the ALJ must procure the assistance of a medical advisor in order to render the informed judgment that the Ruling requires." *Id.* at 79.

Therefore, while the Ruling recommends the use of a medical advisor "when onset must be inferred," the context of this recommendation suggests that it is best understood to apply to cases in which the period in dispute is marked by a gap in the medical evidence. The only mention of a "medical advisor" or "expert" in SSR 83-20 is under the heading of "*Precise Evidence Not Available—Need for Inferences*." The very first sentence under this heading acknowledges the existence of cases in which disability began before the first relevant medical examination. An example provided under the same heading involves just such a fact pattern. Similarly, in *Bailey* the medical evidence from the relevant period was sparse, and the consultative examinations postdated the alleged onset date by some three years. *Bailey*, 68 F.3d at 78. As the Fourth Circuit explained, under those circumstances and "[i]n the absence of clear evidence documenting the progression of Bailey's condition," the ALJ lacked discretion to proceed without consulting an expert. *Id.* at 80.

In contrast, in the case now before the court there is no gap in treatment; there is no lack of available evidence; there is no ambiguity, and there is no decisional need to infer Scott's onset date. As a number of courts have concluded, SSR 83-20 simply is inapposite in cases where the medical evidence provides a complete chronology of the applicant's condition. *Pugh v. Bowen*, 870 F.2d 1271, 1278 n.9 (7th Cir. 1989); *Robertson v. Astrue*, 2011 U.S. Dist. LEXIS 140346, *4

(WDVa. Dec. 6, 2011): *Jones v. Astrue*, 2010 U.S. Dist. LEXIS 55155, * 1-2 (EDVa. Jun. 3, 2010), *affd.* 414 Fed. Appx. 532 (4th Cir. 2011); *McKeever v. Astrue*, 2010 WL 1528562 at *2–3 (EDVa. 2010), *affd.* 416 Fed. Appx. 321 (4th Cir. 2011).

The medical evidence before the ALJ provides a thorough and detailed history of Scott's condition beginning in 2003, and the medical record provides detailed treatment information during the "relevant period." Documentation of the plaintiff's condition and treatment may be susceptible to more than one interpretation, but it requires no inference; it creates no ambiguity and it is more than sufficient to permit the ALJ to make an informed onset date determination.

## F.

Finally, Scott faults the ALJ's failure to fully credit her testimony, most particularly, her statements regarding the frequency and severity of infections and the impact of the illness on her daily activities. She contends that the ALJ should have credited fully her testimony regarding the frequency and severity of flare-ups and her testimony regarding the impact of her illness on her daily activities, and she points to the state agency physicians' finding that her statements were credible. In other words, she argues that the ALJ should have afforded more weight to these explanations.

There are two problems with this argument. First, as Scott appropriately concedes, the ALJ hearings are de novo. Second, it is state agency doctors' medical opinions—not their credibility assessments—that are entitled to weight from the ALJ. In light of the medical

evidence in the record, particularly during the decisionally relevant time period, the ALJ's credibility assessment was entirely reasonable. The plaintiff's statements about the frequency and duration of "exacerbations" requiring intravenous antibiotic therapy were not consistent with the medical evidence. And while she testified that she has to rest every day in the early afternoon because of fatigue, her responses to follow-up questions along with her other statements in the record [10] suggest that this is a more recent trend caused largely by the increasing demands of caring for a growing daughter. (R.37,256). A reasonable fact-finder, therefore could properly conclude that evidence indicating a *recent* deterioration of the plaintiff's condition detracts from, rather than helps, her claim of and 2006 disability onset.

## V.     PROPOSED FINDINGS

As supplemented by the above summary and analysis and on the basis of a careful and thorough examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.     The Commissioner's final decision is rational and in all material respects is supported by substantial evidence;

2.     The Commissioner's decision granting Scott SSI on reconsideration does not in support her claim for DIB;

3.     The ALJ properly considered all relevant medical evidence;

---

[10]  For example, Scott's narrative of her daily activities from her function report dated July 6, 2008, makes no mention of daily early afternoon rest. (R.256).

4.    The ALJ's determination that the Scott had no condition or combination of conditions that met or medically equaled a listed impairment, and in particular that her impairments did not meet or equal Listing 3.04C, is supported by substantial evidence;

5.    The ALJ did not err in failing to hire a medical expert;

6.    The ALJ did not err in failing to weigh disability examiners' assessment of Scott's credibility;

7.    The Commissioner met his burden of proving that through the date last insured the plaintiff possessed the residual functional ability to perform work which existed in significant numbers in the national economy;

8.    Scott has not met her burden of proving a disabling condition through the date last insured; and

9.    All facets of the Commissioner's final decision should be affirmed.


## VI.    DIRECTIONS TO CLERK


The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.


## VII.    Notice to the Parties


Both sides are reminded that pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law

rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: This 5th day of March 2013.

s/ *James G. Welsh*

United States Magistrate Judge